# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

CELESLIE HENLEY and ERNEST
COLBERT, JR.,

               **Plaintiffs,**

      **v.**

TURNER BROADCASTING
SYSTEM, INC., TIME WARNER
INC., CABLE NEWS NETWORK,
INC., and TURNER SERVICES,
INC.,

               **Defendants.**

           **1:16-cv-4506-WSD**

## OPINION AND ORDER

This matter is before the Court on Defendants Turner Broadcasting System, Inc. ("TBS"), Time Warner Inc. ("Time Warner"), Cable News Network, Inc. ("CNN"), and Turner Services, Inc.'s ("TS") (together, "Defendants") Motion to Dismiss, Strike, and/or for More Definite Statement of Plaintiffs' Complaint [17] ("Motion to Dismiss"), Plaintiffs Celeslie Henley ("Henley") and Ernest Colbert, Jr.'s ("Colbert") (together, "Plaintiffs") Motion for Leave to File Surreply in Opposition to Defendants' Reply in Support of its [sic] Motion to Dismiss [34] ("Surreply Motion"), and Plaintiffs' Motion for Leave to Amend the Complaint to Voluntarily Withdraw its [sic] Original Complaint [27] ("Motion to Amend").

## I.     BACKGROUND

A.     <u>Henley's Allegations</u>

Plaintiff Henley is an African-American woman.  (Compl. ¶ 9).  She is forty-four years old and worked for seven years as an Executive Administrative Assistant at CNN.  (Compl. ¶¶ 9, 59, 68).[1]  Before she took maternity leave in March 2013, Henley received favorable performance reviews and a bonus for her work ethic.  (Compl. ¶¶ 59, 70).  When she returned from maternity leave, she "quickly realized that the work environment changed for the worst."  (Compl. ¶ 59).  Her workload increased and her requests for additional support staff were denied.  (Compl. ¶¶ 43, 59).  She "was required to work 12 to 13 hour shifts and remain on-call . . . while other Caucasian executive assistants, in the same department, were only required to work from 8:00A.M. to 4:00P.M."  (Compl. ¶¶ 43, 69).[2]  She was "written up" for failing to timely file an expense report, which, she alleges, should have been handled by others while she was on maternity

---

[1]     Although Henley repeatedly alleges she worked for CNN, she also suggests that she worked in the "Cartoon Network Division of Turner."  (Compl. ¶¶ 59-60).  It appears that the Cartoon Network and CNN are separate entities owned by TBS.  (<u>See</u> Compl. ¶¶ 11-12).

[2]     Henley alleges that these work requirements "were not detailed in her job description."  (Compl. ¶ 69).

leave.  (Compl. ¶¶ 43, 59, 71).  She also was written up for failing to file a credit card report on time.  (Compl. ¶ 71).

On January 9, 2014, Henley emailed Renee White ("White"), the Human Resource Director, complaining about "the discrimination and mistreatment" she received from her managers, including Stuart Snyder, the President and COO of CNN's AYAKAM division.  (Compl. ¶¶ 9, 35, 59).[3]  Plaintiffs do not offer further information about Henley's internal complaint.  White met with Henley, told her that she would investigate Henley's claims, and placed her on administrative leave until the investigation was concluded.  (Compl. ¶ 59).  On January 13, 2014, White told Henley that she was unable to substantiate Henley's allegations and that there was "no disparity in the Cartoon Networks employees' salaries across Turner." (Compl. ¶ 59).  White said she would speak with "the Legal department" the next day "to determine a resolution for Ms. Henley's concerns."  (Compl. ¶ 59).

On January 14, 2014, White called Henley and told her she was being terminated "for failing to file a timely expense report which led to the assessment

---

[3]      Plaintiff does not allege the purpose, function or scope of the "AYAKAM" division, or how many employees and managers are within it.  To the extent AYAKAM refers to TBS's Animation, Young Adults & Kids Media division, the Complaint does not allege where it falls within CNN's corporate structure, if it does at all.  See http://www.marketwired.com/press-release/turner-broadcasting-system-incs-stuart-snyder-deliver-kids-animation-keynote-banff-1628064.htm.

of fees."  (Compl. ¶ 59).  White explained that Henley's termination was unrelated to her discrimination claims "because [White's] investigation had been closed." (Compl. ¶ 59).  Stuart Snyder also was on the call.  (Compl. ¶ 59).  After the call, Henley's work telephone was disabled, she was barred from returning to the office to pack her personal belongings, and she was placed on Turner's "No Rehire Code" list.  (Compl. ¶ 59).  Henley claims she was discriminated against based on her race, sex and pregnancy, and was terminated in retaliation for her complaint to White.  (Compl. ¶ 9).

   B.   Colbert's Allegations

   Colbert is African-American and forty-four years old.  (Compl. ¶ 10).  He has a marketing degree from the University of West Georgia, and has worked for TBS for approximately twenty years.  (Compl. ¶ 10).  In 2007, Henley was promoted to Manager but was not given a "formal job description" and was required to perform Senior Manager work on a salary below his "pay grade." (Compl. ¶¶ 36, 42, 57).  He alleges he was paid "less than Caucasian employees in the same pay grade performing the same job."  (Compl. ¶¶ 10, 42).  Colbert claims he requested, but was denied, a promotion or pay increase while "a similarly situated Caucasian woman in his department" received several pay grade increases. (Compl. ¶¶ 39, 67; see Compl. ¶ 58 ("The Caucasian who held his position

4

previously was promoted to a job grade several levels above Mr. Colbert while performing the exact same job duties as Mr. Colbert.")).  Although Colbert was told in 2007 that he "would soon be promoted to Senior Manager," he was not promoted to that position until August 2016.  (Compl. ¶ 66).  He claims there was no "justification and/or reasoning" for this delay, and that he "is still under paid [sic] in comparison to the Caucasian Senior Managers" in the Programming and Marketing divisions where he and five other African-Americans work.  (Compl. ¶¶ 42, 58, 66).[4]  Henley alleges that, until he was promoted to Senior Manager, TBS failed to maintain his personnel file and that this "nullified" his "years of . . . positive performance evaluations."  (Compl. ¶¶ 10, 36, 42, 57).

C.   <u>Plaintiffs' Class-Wide Allegations</u>

Plaintiffs allege that Defendants have engaged in a pattern and practice of racial discrimination in performance evaluations, compensation, promotions, and terminations.  (Compl. ¶¶ 6, 26).

---

[4]      Of the five other African-Americans in the Programming and Marketing divisions, one is a Vice President, one is a Director, one is a Senior Manager, and one is a Manager.  (Compl. ¶ 66).  Plaintiffs do not identify the position of the fifth African-American.

1.   <u>Performance Evaluations</u>

Plaintiffs allege that "[TBS] and/or CNN . . . maintain[] written and unwritten policies and practices" that discriminate against African-American employees in their performance evaluations.  (Compl. ¶ 26).[5]  Specifically, Plaintiffs allege that "performance evaluations are conducted by managers exercising undue discretion with little or no oversight" and that this results in "biased and inconsistent [performance] determinations."  (Compl. ¶¶ 3, 26, 32). Plaintiffs rely on an "HR Reporting and Analytics" report from July 22, 2013 (the "HR Report"), which shows that, from 2010 to the first quarter of 2013, employees "of color" received a lower performance rating than the average employee in TBS's News, Finance & Accounting, Legal, Public Relations, and Strategy divisions.  ([1.2] at 1, 3, 7-8, 10-11; Compl. ¶ 33).[6]  Plaintiffs claim that African-American employees are harmed because their performance ratings impact their compensation and promotion opportunities.

---

[5]     Plaintiffs, throughout their Complaint, refer generally to "[TBS] and/or CNN" without specifying which allegations refer to which Defendant.  The Complaint does not offer any specific allegations against Defendants Time Warner or TS.

[6]     The HR Report does not define an employee "of color" but a "person of color" is commonly understood to mean "a person who is not white or of European parentage."  https://en.oxforddictionaries.com/definition/us/person_of_color.

2.    Compensation

Plaintiffs allege that "[TBS] and/or CNN maintains a pattern and practice of paying African-American employees less than similarly-situated Caucasian employees." (Compl. ¶ 39). They allege that TBS and/or CNN consider a "variety of factors" in determining employee compensation, "including the employee's pay grade, the employee's position within the salary range of that grade, and the employee's score." (Compl. ¶ 38). They claim Defendants' compensation system allows employees in the same "job grade"[7] to be paid differently, and allows employees in lower job grades to be paid more than employees in higher job grades. (Compl. ¶ 40). Plaintiffs claim that this approach permits "unduly discretionary decisions, resulting in unequal compensation" for African-American employees. (Compl. ¶¶ 26, 38). Plaintiffs rely on the HR Report, which shows that, from 2010 to the first quarter of 2013, employees of color were paid less than the average employee in TBS's Sports, Finance & Accounting, and Legal divisions. ([1.2] at 2-3, 7, 10; Compl. ¶¶ 39, 44). Plaintiffs also allege that white employees, but not an African-American employee, received a bonus for their contribution to a $20 million work project. (Compl. ¶ 29). After the project, the

---

[7]    Plaintiffs do not define or describe the term, "job grade," and it is unclear whether the term is synonymous with "pay grade."

African-American employee was passed over for promotion in favor of "her Caucasian counterpart."  (Compl. ¶ 29).

        3.   <u>Promotions</u>

Plaintiffs allege that, under Turner and/or CNN's "policies and practices," some positions are not posted publicly and are filled through management nominations or other closed forms of "sourcing."  (Compl. ¶¶ 26, 52).  Supervisors are allowed to "essentially handpick candidates through word of mouth for available positions and make promotion decisions on the basis of subjective criteria."  (Compl. ¶¶ 26, 45).  Plaintiffs claim this "prevents qualified African-Americans from competing equally for positions."  (Compl. ¶ 45).

Where a vacancy is posted, Plaintiffs allege that Turner and/or CNN use a "targeted selection procedure" and that this discriminates against African-Americans.  (Compl. ¶¶ 48, 52).  Under this procedure, supervisors conduct "multiple one-on-one interviews" with candidates, ask them "scripted questions," and rate them on "objective criteria" known as "preferred qualifications."  (Compl. ¶¶ 48-51).  Plaintiffs allege that these "preferred qualifications," which are not defined in the Complaint, "mask the prejudicial preference" of the supervisors and that supervisors "essentially are allowed to pre-select candidates before positions are posted."  (Compl. ¶¶ 48, 50-51; <u>see</u>

8

Compl. ¶ 61 ("[A] formal interview process may be a sham to disguise the fact that a candidate has been pre-selected.")).  Plaintiffs allege that "Defendants" promoted a white candidate, who "met some of the preferred qualifications," to a "Chief Human Resource position," even though an African-American applicant had worked for Defendants longer, had undergraduate, M.B.A. and Ph.D. degrees, and had previously supervised the white candidate.  (Compl. ¶ 5).

Plaintiffs rely on the HR Report, which shows that, from 2010 to the first quarter of 2013, employees of color had lower promotion rates than the average employee in TBS's News, Legal, Public Relations, and Media divisions.  ([1.2] at 1, 7-9).  The HR Report also shows that employees of color were underrepresented in Manager, Director, Vice President ("VP") and Senior Vice President ("SVP") positions (together, "Senior Positions") in TBS's News, Finance & Accounting, AYAKAM, Legal, and Strategy divisions, compared to the total number of employees of color in those divisions.  ([1.2]; Compl. ¶¶ 46-47).  Employees of color generally were underrepresented in Senior Positions in TBS's Sports, Entertainment, International, Public Relations, Media, and Research divisions, although they were adequately represented or overrepresented in at least one Senior Position in each division.  ([1.2]).  Plaintiffs claim that senior

African-American employees are concentrated in divisions that are less influential and less profitable than others.  (Compl. ¶ 5).

Plaintiffs allege that white employees often "skip one or two position levels when promoted" while African-American employees "are simply promoted to the lowest next level."  (Compl. ¶ 5).  Plaintiffs further allege that, unlike white employees, African-American employees often are required, without a promotion or a pay increase, to assume the responsibilities of more senior positions.  (Compl. ¶ 5).

### 4.   Involuntary Terminations

Plaintiffs allege that "African-American employees at [TBS] and CNN are involuntarily terminated at a much higher rate than Caucasian employees." (Compl. ¶ 5).  Plaintiffs again rely on the HR Report, which shows that, from 2010 to the first quarter of 2013, employees of color were terminated at a higher rate than the average employee in TBS's Sports, Finance & Accounting, and AYAKAM divisions.  ([1.2] at 2-4).[8]

---

[8]     In TBS's News division, males of color were terminated at a higher rate than the average male, but females of color were terminated at a lower rate than the average female.  ([1.2] at 1).  In TBS's Entertainment division, males of color were terminated at a higher rate, but female employees of color were terminated at a lower rate, than the average employee.  ([1.2] at 5).

D.   <u>Procedural History</u>

On December 6, 2016, Plaintiffs filed their Complaint [1], asserting

discrimination claims on behalf of themselves and the following putative class:

> All African-American persons employed by Defendants in salaried
> positions and mid-level managerial positions (specifically, managerial
> positions inferior to the Director, Vice President, Senior Vice
> President positions) in the United States at any time from April of
> 1997, to the present, who are subject to Defendants' employment and
> human resources policies and practices, including, but not limited to,
> current or former salaried employees of Turner Broadcasting Systems,
> including Turner's subsidiaries, Time Warner, Inc. and Turner
> Services, Inc., and who have been, continue to be, or may in the future
> be, adversely affected by Defendants' racially discriminatory
> employment policies and practices ("the Class").

(Compl. ¶ 17).  Count 1 asserts that, in violation of 42 U.S.C. § 1981, Defendants

engaged in a "pattern and practice" of intentional race discrimination against

Plaintiffs and the Class by denying them equal treatment in promotions,

compensation, performance evaluations, and the "terms and conditions of

employment."  (Compl. ¶ 75).  Count 2 asserts that Defendants intentionally

discriminated against Plaintiffs, in violation of Title VII of the Civil Rights Act of

1964 ("Title VII"), by (1) declining to promote Colbert to Senior Manager until

August 2016, (2) paying Plaintiffs less than similarly situated white employees,

(3) denying Plaintiffs "equal terms and conditions of employment," and

(4) retaliating against Henley for the discrimination complaint made to White.

11

(Compl. ¶ 78).  Count 3 asserts that Defendants' "policies and practices" on

compensation, promotions, and performance evaluations disparately impact

African-American employees, in violation of Title VII.  (Compl. ¶¶ 80-81).

On February 7, 2017, Defendants filed their Motion to Dismiss Plaintiffs'

Complaint.  On March 23, 2017, Plaintiffs filed their Motion to Amend, seeking

leave to amend their Complaint to "clarify" their allegations and assert "new

facts."  ([27] at 2).  Defendants oppose Plaintiffs' Motion to Amend on the grounds

that the proposed Amended Complaint [27.1] ("Proposed Amended Complaint")

does not state viable claims and an amendment would be futile.  ([33]).[9]  On

May 1, 2017, Plaintiffs requested leave to file a surreply in opposition to

Defendants' Motion to Dismiss.  ([34]).

## II.   PLAINTIFFS' SURREPLY MOTION

Plaintiffs seek leave to file a surreply in opposition to Defendants' Motion to

Dismiss.  "The Court normally does not permit sur-replies."  Maid of the Mist

Corp. v. Alcatraz Media, LLC, No. 1:09-cv-1543, 2009 WL 10670645, at *2 n.4

(N.D. Ga. Sept. 3, 2009).  "Neither the Federal Rules of Civil Procedure nor this

Court's Local Rules authorize the filing of surreplies as a matter of right or in the

---

[9]     The Proposed Amended Complaint contains minor changes to the original
Complaint and provides limited, or inconsequential, additional allegations of fact.

ordinary course of litigation." <u>Willoughby v. Youth Villages, Inc.</u>, 219 F. Supp. 3d 1263, 1273 n.23 (N.D. Ga. 2016).  "Such filings will typically be accepted by the Court only in unusual circumstances, such as where a movant raises new arguments or facts in a reply brief, or where a party wishes to inform the Court of a new decision or rule implicating the motion under review." <u>Roelle v. Cobb Cty. Sch. Dist.</u>, No. 1:13-cv-3045, 2014 WL 4457235, at *9 (N.D. Ga. Sept. 10, 2014). "[T]o allow such surreplies as a regular practice would put the court in the position of refereeing an endless volley of briefs." <u>Fedrick v. Mercedes-Benz USA, LLC</u>, 366 F. Supp. 2d 1190, 1197 (N.D. Ga. 2005).

Plaintiffs seek to file a surreply "to correct and address . . . false and misleading representations" in Defendants' reply brief, and to respond to arguments allegedly presented for the first time in Defendants' reply.  ([34] at 2). Plaintiffs' motion does not specifically identify Defendants' new arguments and "false and misleading representations."  Defendants' reply, however, squarely responds to the arguments in Plaintiffs' response brief, and does not advance new arguments.  <u>See</u> <u>Roelle</u>, 2014 WL 4457235, at *9 ("If the new arguments raised in a reply brief directly address arguments raised in the non-movant's response, no surreply is warranted.").  Plaintiffs have not identified "unusual circumstances" in this case, <u>id.</u>, and they "fail[] to demonstrate that a particular argument or

representation made by [Defendants] in [their] reply brief[] warrants the filing of a surreply," Fedrick, 366 F. Supp. 2d at 1197-98.  Plaintiffs' Surreply Motion is denied.[10]

## III.  DEFENDANTS' MOTION TO DISMISS

### A.    Legal Standard

On a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must "assume that the factual allegations in the complaint are true and give the plaintiff[] the benefit of reasonable factual inferences." Wooten v. Quicken Loans, Inc., 626 F.3d 1187, 1196 (11th Cir. 2010).  Although reasonable inferences are made in the plaintiff's favor, "'unwarranted deductions of fact' are not admitted as true." Aldana v. Del Monte Fresh Produce, N.A., 416 F.3d 1242, 1248 (11th Cir. 2005) (quoting S. Fla. Water Mgmt. Dist. v. Montalvo, 84 F.3d 402, 408 n.10 (11th Cir. 1996)).  The Court is not required to accept, as true, conclusory allegations or legal conclusions.  See Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1290 (11th Cir. 2010) (construing Ashcroft v. Iqbal, 556 U.S. 662 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)); see Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1263

---

[10]    Even if the Court considered Plaintiffs' proposed surreply, it would not change the Court's decision on Defendants' Motion to Dismiss.

(11th Cir. 2004) ("[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." (quoting Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1188 (11th Cir. 2002) (internal quotation marks omitted))).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Mere "labels and conclusions" are insufficient. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).  This requires more than the "mere possibility of misconduct." Am. Dental, 605 F.3d at 1290 (quoting Iqbal, 556 U.S. at 679).  The well-pled allegations must "nudge[] [plaintiff's] claims across the line from conceivable to plausible." Id. at 1289 (quoting Twombly, 550 U.S. at 570).

B.    Plaintiffs' Complaint

The Court begins its analysis of Plaintiffs' Complaint with some preliminary observations.  The Complaint is poorly drafted, difficult to follow, and unclear.  It

15

is fraught with conclusory claims, unsupported by factual allegations sufficient to support the inferences claimed by Plaintiffs.  It wholesale ignores the plausibility required by Iqbal.  This conclusion is supported by the Complaint itself.  Plaintiffs refer generally to "[TBS] and/or CNN," without specifying which allegations refer to which Defendant, and the Complaint does not offer any specific allegations against Defendants Time Warner and TS.  The Complaint also is littered with conclusory assertions, rank speculation, confusing statements, and generalized allegations that lack factual support.  For example:

- Plaintiffs rely heavily on "Turner and/or CNN's Human Resources Diversity Trends Report," claiming—without explanation and with an eye toward sensationalism—that its "stark statistics can *only* be attributed to" discrimination.  (Compl. ¶¶ 4-5 (emphasis added); see also Compl. ¶ 33 ("There is no objective factor other than race that can explain th[e] disparity" in employee performance evaluations); Compl. ¶ 3 ("There is no factor (such as job grade, experience, or similar factors) that could explain this race-based difference in [performance] scores.")).  Plaintiffs do not clearly identify the particular Defendant to which the statistics relate, and, as explained later in this Order, there are several non-discriminatory factors that could explain the statistics in the HR Report.

- The Complaint alleges, without any explanation or elaboration, that Cartoon Network "employed over twenty-five (25) African-Americans who never received the opportunity to matriculate to permanent status."  (Compl. ¶ 60).

- Although the body of the Complaint alleges, in a single sentence, that Henley "was discriminated against and mistreated in the workforce based on . . . sex and pregnancy," none of the counts asserted in the

16

Complaint refer to sex- or pregnancy-based discrimination.  (Compl. ¶ 9).

- Plaintiffs baldly assert that Colbert was "required to work twice as hard as his Caucasian counterparts," but later allege that African-Americans are required to "labor three times as long as Caucasians."  (Compl. ¶¶ 42, 46).

- The Complaint alleges, without any factual support, that "African-Americans in senior positions are concentrated in less powerful and non-revenue-generating areas."  (Compl. ¶ 5).

- The Complaint alleges the speculative conclusion that Defendants' "formal interview process *may* be a sham to disguise the fact that a candidate has been pre-selected."  (Compl. ¶ 61 (emphasis added)).

- Although Henley repeatedly alleges she worked for CNN, she also suggests that she worked in the "Cartoon Network Division of Turner" and that her superior was "the President/COO of CNN's AYAKAM Division."  (Compl. ¶¶ 9, 59-60).  AYAKAM appears to be a TBS division unrelated to CNN, and the Complaint does not allege that Cartoon Network is part of CNN.

- Plaintiffs allege that, "although African-Americans make up about 30-35 percent of the employees in the mid-level managers and staffing positions, they are extremely under-represented at higher pay grades and senior positions."  (Compl. ¶ 5).  Plaintiffs fail to identify the particular corporate entity or entities to which these statistics relate.[11]

---

[11]    Plaintiffs' fast-and-loose approach to their Complaint also is evidenced by their allegation that TBS "owns the professional baseball team Atlanta Braves." (Compl. ¶ 11).  As Atlantans know, and as a simple Google search reveals, the Atlanta Braves are owned by Liberty Media, not TBS.  The Court, however, accepts as true this allegation of the Complaint in its analysis.

The Court, later in this Order, addresses several other examples of Plaintiffs' unsupported allegations.

C.     Count 1 of Plaintiffs' Complaint

Count 1 asserts that, in violation of 42 U.S.C. § 1981, Defendants engaged in a "pattern and practice" of intentional race discrimination against Plaintiffs and the Class by denying them equal treatment in compensation, promotions, performance evaluations, and the "terms and conditions of employment."  (Compl. ¶ 75).  Plaintiffs appear to assert section 1981 claims in their individual capacity and as representatives of the putative Class.

1.     Plaintiffs' Individual Section 1981 Claims

a)     Legal Standard

Section 1981 provides that all persons "shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C § 1981(a).  This includes equal rights in "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C § 1981(b).  "To state a claim of race discrimination under § 1981, a plaintiff must allege facts establishing: (1) that he is a member of a racial minority; (2) that the defendant intended to discriminate on the basis of race; and (3) that the

discrimination concerned one or more of the activities enumerated in the statute." Moore v. Grady Mem'l Hosp. Corp., 834 F.3d 1168, 1171-72 (11th Cir. 2016).

Section 1981 requires a showing of "purposeful discrimination," Ferrill v. Parker Grp., Inc., 168 F.3d 468, 472 (11th Cir. 1999), and "provides protection only on the basis of race," Rollins v. Alabama Cmty. Coll. Sys., 814 F. Supp. 2d 1250, 1259 n.1 (M.D. Ala. 2011). Plaintiff's allegations must "support a reasonable expectation that discovery would reveal evidence that these Defendants acted with racially-discriminatory animus." Ford v. Strange, 580 F. App'x 701, 713 (11th Cir. 2014); see Jackson, 372 F.3d at 1274 (stating that plaintiff's allegations must support the inference "that racial animus motivated the defendants").

"If a plaintiff fails to show the existence of a similarly-situated employee, judgment as a matter of law is appropriate where no other plausible allegation of discrimination is present." Arafat v. Sch. Bd. of Broward Cty., 549 F. App'x 872, 874 (11th Cir. 2013). "When comparing similarly situated individuals to raise an inference of discriminatory motivation, the individuals must be similarly situated in all relevant respects besides race, since different treatment of *dissimilarly* situated persons does not violate civil rights laws." Jackson, 372 F.3d at 1273. For example, in Arafat, the plaintiff claimed she was underpaid by her employer

because she was a woman.  549 F. App'x 872.  She alleged that "'male and younger' employees who worked jobs 'requiring equal skill, effort and responsibility' were paid more than her during her employment." Id. at 875.  The Eleventh Circuit dismissed plaintiff's claim on the grounds that "[s]he did not plead the facts comparing her skill, effort, and responsibility levels to those younger males who were allegedly paid more than her." Id.  In Toomer v. Savannah Rose of Sharon, LLC, No. 4:12-cv-057, 2012 WL 952755 (S.D. Ga. Mar. 20, 2012), plaintiff claimed an employer declined to hire him because he was black.  Plaintiff alleged that he applied for an office clerk position for which he was qualified, and that a less qualified white applicant was hired to fill the position.  The court dismissed plaintiff's discrimination claim for failure to "state what the job's requirements were, how he met them, and how the job's white recipient was (a) similarly situated; yet (b) met or fell beneath his qualification level." Id. at *2.

b)    Henley's Individual Section 1981 Claims

Henley claims she enjoyed a positive working experience until she returned from maternity leave, when her workload increased significantly and her requests for additional support staff were denied.  (Compl. ¶¶ 59, 71).  She "was required to work 12 to 13 hour shifts and remain on-call . . . while other Caucasian executive

20

assistants, in the same department, were only required to work from 8:00A.M. to 4:00P.M." (Compl. ¶¶ 43, 59, 69-70). She was "written up" for failing to timely file an expense report, which, she alleges, should have been handled by others while she was on maternity leave. (Compl. ¶¶ 43, 59, 71). She also was written up for failing to file a credit card report on time. (Compl. ¶ 71).

These allegations do not plausibly allege purposeful race discrimination. Henley "does not identify any specific, similarly situated, non-minority individual who was treated better in a similar situation." Scott v. Lake Arrowhead Yacht & Country Club, Inc., No. 1:15-cv-00158, 2016 WL 4541442, at *3 (N.D. Ga. Aug. 31, 2016); see Jackson, 372 F.3d at 1274 (granting defendant's motion to dismiss a section 1981 claim where plaintiff failed to "identify *any* specific nonminority employees . . . who were treated differently in other similar cases"). Her only reference to a comparator is her general allegation that "other Caucasian executive assistants[] in the same department" worked fewer hours. This is insufficient because it fails to identify or describe the comparators in enough detail to "show that [Henley] and the employees are similarly situated in all relevant respects" or that they are "nearly identical." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997); see Benjamin v. Holy Cross Hosp., No. 11-cv-62142, 2012 WL 1900026, at *2

21

(S.D. Fla. May 24, 2012) (noting, at the motion to dismiss stage, that

"a comparator must be similarly situated in all relevant respects and nearly

identical to the plaintiff"); Scribner v. Collier Cty., No. 2:10-cv-728, 2011 WL

2746813, at *4 & n.5 (M.D. Fla. July 14, 2011) (noting that "the comparator must

be nearly identical to prevent courts from second-guessing employers' reasonable

decisions," and granting defendants' motion to dismiss plaintiff's discrimination

claims because "plaintiff's allegations of a comparator are insufficient").

Henley does not allege, for example, that she and the comparators were

equally qualified and competent, or that they worked for the same supervisor on

similar matters.  See Caraway v. Sec'y, U.S. Dep't of Transp., 550 F. App'x 704,

710 (11th Cir. 2013) (stating, at the motion to dismiss stage, that "differences in

treatment by different decision makers can seldom be the basis for a viable claim

of discrimination"); Silvera v. Orange Cty. Sch. Bd., 244 F.3d 1253, 1261 n.5

(11th Cir. 2001) ("[D]ifferences in treatment by different supervisors . . . can

seldom be the basis for a viable claim of discrimination."); Moore v. Shands

Jacksonville Med. Ctr., Inc., No. 3:09-cv-298, 2013 WL 12178164, at *7 (M.D.

Fla. Oct. 18, 2013) ("A comparator and a plaintiff are dissimilar if they do not have

in common similar levels of experience or education.").  Henley also does not

describe the structure of her division, whether there are subdivisions or discrete

groups within it, and does not allege facts about the role or responsibilities of

executive assistants, including whether and how they vary.  Henley does allege that

she enjoyed a positive working environment before her pregnancy, and

experienced mistreatment only after returning from maternity leave, which

suggests that race was not the reason for her alleged mistreatment.  See Iqbal, 556

U.S. at 682 (finding that plaintiff's allegation of purposeful discrimination was not

plausible in light of an "obvious alternative explanation"); Lewis v. Bentley, No.

2:16-cv-690, 2017 WL 432464, at *11 (N.D. Ala. Feb. 1, 2017) (stating that a

discrimination claim "is not plausible where there is an obvious alternative

explanation for the conduct other than intentional discrimination");

Heard v. Hannah, 51 F. Supp. 3d 1129, 1144 (N.D. Ala. 2014) (dismissing a race

discrimination claim where the "the Amended Complaint itself supplies more than

ample reason to think that Plaintiff's [alleged mistreatment] was motivated by

reasons that were not race-based").[12]  Although Henley's allegations are

---

[12]      To the extent this suggests that Henley's sex or pregnancy was the reason for her alleged mistreatment, this does not support a violation of section 1981, which "is directed exclusively toward racial discrimination."  Tucker v. Talladega City Sch., 171 F. App'x 289, 295 (11th Cir. 2006); see Hayden v. Atlanta Newspapers, A Div. of Cox Enterprises, Inc., 534 F. Supp. 1166, 1168 (N.D. Ga. 1982) ("Section 1981 proscribes race, and not sex, discrimination.").  To the extent Henley developed a backlog of work as a result of her maternity leave, this materially differentiates Henley from other executive assistants in her division.

"consistent" with intentional race discrimination, and may support a "suspicion" or "possibility" of misconduct, they do not raise "a reasonable expectation that discovery would reveal evidence that these Defendants acted with racially-discriminatory animus."  Twombly, 550 U.S. at 555, 557; Ford, 580 F. App'x at 713.

Henley next asserts that she was terminated in retaliation for complaining internally about "discrimination and mistreatment" at work.  (Compl. ¶¶ 9, 35, 59).  "To state a retaliation claim under § 1981, a plaintiff must allege a defendant retaliated against him because the plaintiff engaged in statutorily protected activity."  Jimenez v. Wellstar Health Sys., 596 F.3d 1304, 1311 (11th Cir. 2010).  "An employee engages in protected activity if he opposes an employment practice based on a good faith, [objectively] reasonable belief that the practice violates . . . Section 1981."  Canty v. Fry's Elecs., Inc., No. 1:09-cv-3508, 2012 WL 1038611, at *5 (N.D. Ga. Mar. 27, 2012); see Bryant v. U.S. Steel Corp., 428 F. App'x 895, 898 (11th Cir. 2011) ("In order for a plaintiff's actions to be a protected activity, she must show both that she believed in good faith that her employer was engaged in unlawful employment practices, and that her belief was

(See Compl. ¶ 43 (suggesting that Henley, when she returned from maternity leave, was responsible for work that should have been completed while she was on maternity leave)).

*objectively* reasonable in light of the facts and record presented.").  "[I]n order to constitute statutorily protected activity capable of supporting a § 1981 retaliation claim, an employee's complaint must reasonably convey that she is opposing discrimination based specifically upon race, versus some other type of discrimination or injustice generally."  Cochran v. S. Co., No. 14-cv-0569, 2015 WL 3508018, at *2 (S.D. Ala. June 3, 2015); see Adams v. Cobb Cty. Sch. Dist., 242 F. App'x 616, 620 (11th Cir. 2007) (noting that section 1981 "prohibits an employer from retaliating against its employee as a response to the employee's complaint of race-based discrimination."); Turner v. McKesson Corp., No. 2:12-cv-2053, 2013 WL 4727651, at *8 (N.D. Ala. Sept. 3, 2013) ("[T]o be considered protected activity under § 1981, any complaints must include some sort of reference to race discrimination or harassment.").

Henley fails to state a retaliation claim under section 1981 because she does not clearly plead that her internal complaint (1) alleged race discrimination or (2) addressed conduct, viewed objectively, that could reasonably be regarded as prohibited by section 1981.  Although Henley states that she reported "discrimination and mistreatment" to a human resources employee, she does not provide further information about her complaint.  (Compl. ¶¶ 9, 35, 59).  In view of the allegations in the Complaint, it is possible that she complained about (1) her

workload after returning from maternity leave, (2) being written up for untimely submitting expense reports, or (3) her salary.  (See Compl. ¶ 59 (alleging that White informed Henley, after investigating her discrimination complaint, that there was "no disparity in the Cartoon Networks employees' salaries across Turner"). It is further possible that Henley's complaint alleged that her mistreatment occurred on the grounds of race, sex, or pregnancy.  (Compl. ¶ 9 (claiming discrimination on the grounds of race, sex and pregnancy)).  Henley, having failed to identify the content of her complaint, does not allege facts—and leaves only speculation—that she expressed opposition to intentional race discrimination and that her complaint addressed conduct, viewed objectively, that reasonably could be regarded as a violation of section 1981.  Henley's retaliation claim fails because she does not proffer enough factual content to "raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555; see Iqbal, 556 U.S. at 678-79 (stating that a complaint must plead enough "factual content" to establish an entitlement to relief that is more than possible).  Henley fails to state a claim under section 1981,[13] and her allegations do not support that Defendants engaged in a

---

[13]     Plaintiffs' Complaint makes it difficult to determine the specific claims asserted.  In "Count One," entitled "discrimination against the named Plaintiffs and the Class in violation of section 1981," Plaintiffs allege:

pattern and practice of intentional race discrimination against Plaintiffs and the Class.[14]

### c)   Colbert's Individual Section 1981 Claims

Colbert alleges that, when he was a mid-level Manager in TBS's Entertainment division, (1) he was paid "less than Caucasian employees in the same pay grade performing the same job," even though he worked "twice as hard as his Caucasian Counterparts" (Compl. ¶¶ 10, 42); (2) he requested, but was

---

> Defendant has intentionally discriminated against Plaintiffs and the Class in violation of Section 1981 by a pattern and practice of (1) paying African-Americans salaried employees and mid-level managerial employees less than comparable Caucasian employees; (2) denying promotions to qualified African-American salaried employees and mid-level managerial employees on the basis of race; (3) giving African-American salaried employees and mid-level managerial employees lower evaluations than Caucasian employees on the basis of race; and (4) denying African-American salaried employees and mid-level managerial employees equal terms and conditions of employment.

(Compl. ¶ 75).  To the extent that Henley alleges intentional race discrimination based on pay, promotions, evaluations, and terms and conditions of employment, her claims are dismissed.

[14]   Even if Henley's internal complaint alleged racial discrimination on the grounds that she received write-ups and additional work after returning from maternity leave, Henley's retaliation claim still would fail because, for the reasons stated earlier in this Order, her write-ups and additional workload do not warrant an objectively reasonable belief that she was subject to intentional race discrimination under section 1981.  See Bryant v. U.S. Steel Corp., 428 F. App'x 895, 898 (11th Cir. 2011).

denied, a promotion or pay increase while "a similarly situated Caucasian woman in his department" received several pay grade increases, (Compl. ¶¶ 39, 67); and (3) "[t]he Caucasian who held his position previously was promoted to a job grade several levels above Mr. Colbert while performing the exact same job duties as Mr. Colbert," (Compl. ¶ 57).  Colbert also alleges that, since his promotion to Senior Manager in 2016, he has been underpaid "in comparison to the Caucasian Senior Managers" in the Programming and Marketing divisions where he works. (Compl. ¶¶ 42, 58, 66).

These allegations do not plausibly allege purposeful race discrimination because "there is insufficient information alleged to determine whether the employees identified as receiving [promotions or] higher pay qualify as similarly situated comparators."  Benjamin, 2012 WL 1900026, at *2 (granting a motion to dismiss plaintiff's discrimination claims).  For example, Colbert does not allege that his comparators "had similar levels of experience or education," had "similar levels of seniority," or received similar performance evaluations.  Cooper v. S. Co., 390 F.3d 695, 741, 743, 745 (11th Cir. 2004); see Benjamin, 2012 WL 1900026, at *2 (relying on Cooper to grant a motion to dismiss); Henderson v. Dade Cty. Police Benev. Ass'n, Inc., No. 14-cv-20321, 2014 WL 3591600, at *7 (S.D. Fla. July 18, 2014) (granting defendant's motion to dismiss plaintiff's race

discrimination claims because "Plaintiff has not alleged how each [comparator] is 'nearly identical' to the plaintiff, or how they are similarly-situated 'in all relevant aspects,'" including because plaintiff did not allege that the promoted comparators "were equally or less qualified than her"). Each of these variables "may constitute a legitimate, non-discriminatory justification for differences in compensation" or promotions. Cooper, 390 at 743.

Colbert's failure to address these variables undermines the plausibility of his discrimination claim, and leaves only a "possibility" of racially-discriminatory animus. Twombly, 550 U.S. at 555, 557; Ford, 580 F. App'x at 713; Jackson, 372 F.3d at 1274; see Burgis v. N.Y. City Dep't of Sanitation, 798 F.3d 63, 69 (2d Cir. 2015) ("Without any specificity as to the qualifications considered for each position [to which plaintiffs seek promotion] and without any reference to specific statements or individual circumstances that suggest discriminatory treatment, plaintiffs' allegations do not support a finding [at the pleading stage] that defendants acted with a discriminatory purpose."). To the extent Colbert repeatedly describes other employees as "similarly situated Caucasions," "Caucasian counterparts" or "comparable Caucasian employees," (see, e.g., Compl. ¶¶ 10, 39, 41-42, 66), these allegations are "precisely the sort of label and conclusion [and] formulaic recitation of the element of a cause of action that the

*Twombly* Court found inadequate."  Ashmore v. F.A.A., No. 11-cv-60272, 2011

WL 3915752, at *4 (S.D. Fla. Sept. 2, 2011).  Colbert fails to state a claim under

section 1981, and his allegations do not support that Defendants engaged in a

pattern and practice of intentional race discrimination against Plaintiffs and the

Class.[15]  Plaintiffs' individual section 1981 claims are dismissed.[16]

   2. Plaintiffs' Section 1981 Class Claims

    a) Legal Standard

Count 1 asserts that Defendants engaged in a "pattern and practice" of race

discrimination against the Class.  To state a plausible claim for pattern and practice

discrimination, plaintiffs must show that "discrimination is the company's standard

operating procedure—the regular rather than unusual practice." E.E.O.C. v. Joe's

Stone Crab, Inc., 220 F.3d 1263, 1287 (11th Cir. 2000).[17]  Plaintiff must allege

---

[15] Colbert alleges that he did not receive a formal job description and that TBS
failed to maintain his personnel file.  (Compl. ¶¶ 10, 36, 42, 57).  These allegations
fail to state a claim under section 1981, because Colbert does not allege that
similarly situated white individuals were treated differently.

[16] As the Court noted in footnote 13, it is hard also to determine the claims
asserted by Colbert.  To the extent Colbert alleges intentional race discrimination
based on pay, promotions, evaluations, and terms and conditions of employment,
these claims are dismissed.

[17] The Court draws on Title VII case law because "the same analytical
framework and proof requirements that apply to employment discrimination claims
under Title VII also apply to discrimination claims under Section 1981."
Surtain v. Hamlin Terrace Found., 789 F.3d 1239, 1245 n.6 (11th Cir. 2015)

"more than the mere occurrence of isolated or accidental or sporadic

discriminatory acts." Id. at 1286-87.  "[P]attern or practice cases are a variant of

the disparate treatment theory and thus proof of discriminatory motive is critical."

Id. at 1287.  "A plaintiff may establish a pattern or practice claim through a

combination of strong statistical evidence of disparate impact coupled with

anecdotal evidence of the employer's intent to treat the protected class unequally."

Id.

### b)     Inadequate Class Representatives

"When a named plaintiff has no cognizable claim for relief, she cannot

represent others who may have such a claim, and her bid to serve as a class

representative must fail."  Sanford v. MemberWorks, Inc., 625 F.3d 550, 560 (9th

Cir. 2010).  The Court previously concluded that Plaintiffs, in their individual

capacity, fail to state a claim under section 1981.  Plaintiffs are thus precluded

from asserting section 1981 claims on behalf of the putative Class.  Plaintiffs'

section 1981 Class claims are required to be dismissed for this reason.  See

Hardy v. Fischer, 701 F. Supp. 2d 605, 611 n.5 (S.D.N.Y. 2010) ("In order for the

---

(discussing Title VII and section 1981 claims together at the motion to dismiss
stage); see also Cooper v. S. Co., 260 F. Supp. 2d 1352, 1356-57 (N.D. Ga. 2003),
aff'd, 390 F.3d 695 (11th Cir. 2004) (noting that pattern and practice claims are
viable under section 1981).

[putative class action] complaint to survive this motion to dismiss, the allegations of at least one named plaintiff must state a claim for relief."); Pruell v. Caritas Christi, No. 09-cv-11466, 2010 WL 3789318, at *4 (D. Mass. Sept. 27, 2010) ("To survive a motion to dismiss [in a putative class action], the allegations of at least one named plaintiff must state a claim for relief."); Sheet Metal Workers 441 Health & Welfare Plan v. GlaxoSmithKline, 263 F.R.D. 205, 210 (E.D. Pa. 2009) ("[W]hen the *named plaintiff* lacks a cause of action, the Court should dismiss the action before proceeding to class certification."); Burks v. Arvest Bank, No. 4:06-cv-00551, 2006 WL 3512478, at *2 (E.D. Ark. Dec. 6, 2006) ("Since the Court has dismissed the sole named Plaintiff's individual claims, the Court must dismiss the class allegations as well and no notice of this involuntary dismissal need be given to any alleged unnamed class members."); see also Zimmerman v. HBO Affiliate Group, 834 F.2d 1163, 1169 (3d Cir.1987) ("[T]o be a class representative on a particular claim, the plaintiff himself must have a cause of action on that claim.").

c)   Failure to Allege Plausible Section 1981 Class Claims

Even if Plaintiffs could assert section 1981 claims on behalf of the putative Class, Plaintiffs have failed to plausibly allege that Defendants engaged in a pattern and practice of race discrimination against Plaintiffs and the Class.

(1)    Defendants' Undue Discretion

Plaintiffs complain that Defendants exercise "undue discretion" in determining compensation, promotions, and performance evaluations. (See, e.g., Compl. ¶ 3).  The Complaint lacks any facts describing Defendants' evaluation process, and provides insufficient information about Defendants' compensation process.  The limited facts alleged do not support Plaintiffs' "undue discretion" claim.  (See, e.g., Compl. ¶ 38 (alleging that Defendants consider a "variety of factors" in determining employee compensation, "including the employee's pay grade, the employee's position within the salary range of that grade, and the employee's score")).  Plaintiffs allege that Defendants generally use a "targeted selection procedure" to fill open positions.  (Compl. ¶ 48).  Supervisors conduct "multiple one-on-one interviews" with candidates, ask them "scripted questions," and rate them on "objective criteria" known as "preferred qualifications."  (Compl. ¶¶ 48-51).  The use of "scripted questions" and "objective criteria" suggests limited, not excessive, discretion.  Plaintiffs do not describe the "objective criteria" and they do not explain how promotion decisions are made after the candidates are interviewed and rated.  Plaintiffs have not plausibly alleged that Defendants utilize "undue discretion" in determining compensation, promotions, and performance evaluations.  Even if they had, "an employer's use of

subjective factors in making decisions does not raise a red flag." Cooley v. Great
S. Wood Preserving, 138 F. App'x 149, 160 n.6 (11th Cir. 2005) (rejecting
plaintiffs' argument that the defendant's "discretion in making employment
decisions" suggested race discrimination).  "[A]n employer's policy of leaving
[employment] decisions to the unchecked discretion of lower level supervisors
should itself raise no inference of discriminatory conduct." Watson v. Fort Worth
Bank & Trust, 487 U.S. 977, 990 (1988); see Criner v. Texas--New Mexico Power
Co., 470 F. App'x 364, 370 (5th Cir. 2012) ("The Supreme Court has stated
numerous times that a subjective decision making process does not raise inferences
of discriminatory conduct.").[18]

### (2)     Anecdotes and Conclusory Allegations

Plaintiffs offer several conclusory allegations to support their claim that
Defendants engaged in a pattern and practice of intentional race discrimination.
Plaintiffs allege that "[a]lthough [CNN] has a policy requiring managers to be
evaluated on their [Equal Employment Opportunity] performance, in practice,
Turner and/or CNN frequently fails to perform this critical evaluation." (Compl.

---

[18]     Plaintiffs allege that Defendants sometimes fill positions through
management nomination or other closed forms of "sourcing."  (Compl. ¶¶ 26, 52).
This allegation, without more, is not sufficient to plausibly allege purposeful race
discrimination.

¶ 63).  Plaintiffs claim that "African-American employees have had to endure racial slurs and prejudicial biases from their superiors such as, 'it's hard to manage black people' and 'who would be worth more:  black slaves from times past, or new slaves.'"  (Compl. ¶ 27).[19]  Plaintiffs assert that Turner and/or CNN "den[ies] African-American employees equal training, mentoring, and work assignments," and that "some of Turner and/or CNN's administrative practices reflect condescending or stereotypical attitudes toward African-Americans."  (Compl. ¶¶ 26, 31).  Plaintiffs allege that white employees often "skip one or two position levels when promoted" while African-American employees "are simply promoted to the lowest next level."  (Compl. ¶ 5).  Plaintiffs further allege that, unlike white employees, African-American employees often are required, without a promotion or a pay increase, to assume the responsibilities of more senior positions.  (Compl. ¶ 5).  The Complaint does not provide "further factual enhancement" for any of these "naked assertions."  Iqbal, 556 U.S. at 678 ("[A] complaint [does not] suffice if it tenders naked assertions devoid of further factual enhancement.").  Because the allegations described in this paragraph are conclusory, generalized and unsupported by factual allegations, Plaintiffs'

---

[19]     Plaintiffs do not offer further information about these statements, including when they were made, to whom they were made, which "superiors" made them, or the circumstances under which they were made.

discrimination claim is not plausibly alleged.  See Jackson, 372 F.3d at 1263

(stating that "conclusory allegations, unwarranted deductions of facts or legal

conclusions masquerading as facts will not prevent dismissal," and dismissing

plaintiffs' section 1981 claim because their allegations were "wholly conclusory,

generalized, and non-specific").

Plaintiffs next allege that "[o]ther Caucasians," but not an African-American

employee, received a bonus for their contribution to a $20 million work project.

(Compl. ¶ 29).  After the project, the African-American employee was passed over

for promotion in favor of "her Caucasian counterpart."  (Compl. ¶ 29).  These

broad, conclusory allegations—based on a single project about which no details are

alleged, including the number of employees who worked on it—do not plausibly

allege intentional race discrimination because "there is insufficient information

alleged to determine whether the employees identified as receiving [a bonus or

promotion] qualify as similarly situated comparators."  Benjamin, 2012 WL

1900026, at *2.  Plaintiffs do not provide meaningful information about the

African-American employee who allegedly experienced discrimination, the "other

Caucasians" who received a bonus, or the "Caucasian counterpart" who was

promoted.  Plaintiffs also fail to describe the individuals' contributions to the

project, the type of project, the number of people who worked on it, or the number of bonuses given and for what reason.

Plaintiffs allege that an unnamed African-American applicant for a human resources position, employed somewhere within Defendants' network of companies, was overlooked in favor of a less-qualified white candidate:

> Defendants selected a Caucasian for a Chief Human Resource position simply because the individual met some of the 'preferred qualifications'; however, in reviewing the entire candidate slate (pool) and their respective resumes, Defendants' Caucasian selection was far less qualified than the African-American who was the only candidate who possessed a PhD, an MBA degree, an undergraduate degree and who possessed more years of experience within Defendants' Networks.  In fact, the Caucasian who was selected had previously reported to the more qualified African-American who was passed over.

(Compl. ¶ 5).  These allegations do not show that Defendants declined to promote the unidentified African-American applicant because of racially-discriminatory animus.  Plaintiffs allege that the white applicant, during his interviews, "met some of the 'preferred qualifications'" on which Defendants apparently based their hiring decision.  Plaintiffs do not allege facts about the African-American candidate's interview performance or about his satisfaction of Defendants' preferred qualifications.  See Wilson, 376 F.3d at 1091 (stating that "[t]he plaintiff and the employee she identifies as a comparator must be similarly situated in all relevant respects" and that "[t]he comparator must be nearly identical to prevent

37

courts from second-guessing a reasonable decision by the employer"); Jackson,

372 F.3d at 1273 (making the same point in the motion to dismiss context);

Eldredge v. EDCare Mgmt., Inc., No. 12-cv-61984, 2014 WL 590336, at *2

(S.D Fla. Feb. 14, 2014) (making the same point in the motion to dismiss context).

Plaintiffs also fail to describe the experience and qualifications of the white

applicant, do not explain the relevance of each candidate's experience and

qualifications to the position for which they applied, do not describe the applicants'

performance evaluations or compensation, and do not identify the internal

positions from which the candidates applied.  There are a myriad of plausible

non-discriminatory reasons for Defendants' employment decision.

        Even if Plaintiffs' allegations did suggest racially-discriminatory animus

against the African-American employee who applied for the "Chief Human

Resource position," they do not show that the named Plaintiffs were subject to

discrimination, and they are insufficient to support a pattern and practice claim

against the Defendants named because they allege only a single incident of

plausible discrimination.  See Joe's Stone Crab, 220 F.3d at 1287 (stating that, to

establish a pattern and practice claim, "isolated or accidental or sporadic

discriminatory acts" are insufficient because racial discrimination must be "the

company's standard operating procedure"); cf. Reeves v. Fed. Reserve Bank of

Chicago, No. 00-cv-5048, 2003 WL 21361735, at *13 (N.D. Ill. June 12, 2003) ("[A]necdotal evidence relating to a few employees in one department of one of an employer's locations is not enough to state a pattern and practice claim where an employer employs over 2,000 employees in numerous locations with numerous department[s].").

Plaintiffs' paucity of generalized anecdotes and conclusory allegations do not support their claim that Defendants engaged in a pattern and practice of intentional race discrimination against Plaintiffs and the Class.

(3)    Statistics

Plaintiffs rely heavily on the statistics in TBS's HR Report.  "Statistics may be used to establish an individual plaintiff's claim that a pattern or practice of discrimination existed, or simply to bolster the plaintiff's circumstantial evidence of individual disparate treatment."  Cooper v. S. Co., 260 F. Supp. 2d 1352, 1357 (N.D. Ga. 2003), aff'd, 390 F.3d 695 (11th Cir. 2004).  "A showing of disparate impact through a neutral practice is insufficient to prove a § 1981 violation because proof of discriminatory intent is essential."  Ferrill v. Parker Grp., Inc., 168 F.3d 468, 472 (11th Cir. 1999).

The HR Report shows that, from 2010 through the first quarter of 2013, employees "of color" received lower performance evaluations, were paid less, or

39

were promoted at a lower rate than the average employee in some, but not all, TBS divisions.[20]  This data does not plausibly show that Defendants engaged in intentional racial discrimination against the named Plaintiffs or the Class, and does not show intentional discrimination in divisions within TBS.  First, the data focuses on disparities between the average employee and employees "of color."  Although the HR Report does not define an employee "of color," the term appears to include several races other than African-American.  See https://en.oxforddictionaries.com/definition/us/person_of_color (defining a "person of color" as "a person who is not white or of European parentage").[21]  Because the HR Report does not separate African-Americans from other employees of color, it does not provide support for the claims asserted based on the status of African-Americans in TBS divisions.  See Burke-Fowler v. Orange Cty., Fla., 447 F.3d 1319, 1325 (11th Cir. 2006) ("[T]he Supreme Court has emphasized the importance of looking to the proper base group when making statistical comparisons and examining all of the surrounding facts and circumstances which create the statistics themselves.").

---

[20]    The report apparently does not contain any data for Defendants Time Warner, CNN or TS.

[21]    That the HR Report divides employees into only two racial groups—"white" and "of color"—supports the conclusion that it uses the term "of color" to refer to nonwhite employees generally.  (See [1.2] at 2-11).

Second, even if the HR Report was a basis for alleging that African-Americans received lower performance ratings, were promoted at lower rates and were paid less than the average employee in certain TBS divisions, the report does not plausibly allege that Defendants engaged in purposeful race discrimination. The report "indicate[s] average salaries[, performance ratings and promotion rates] of employees divided by racial classification but do[es] not control for factors such as education, experience or skill level and thus cannot prove that Defendants discriminated on the basis of race." Cooper v. S. Co., 260 F. Supp. 2d 1352, 1368 (N.D. Ga. 2003), aff'd, 390 F.3d 695 (11th Cir. 2004).[22]  That the data shows employees of color were underrepresented in certain Senior Positions also is not enough.  The report "show[s] only the raw percentages of White [and of-color] individuals at each employment level, without providing any detail as to the

---

[22]    Count 1 of the Complaint does not specifically allege that Defendants discriminated in their termination of employees.  Even if it did, the claim is not supported by the HR Report's finding that African-American employees are terminated at a higher rate than the average employee in certain TBS divisions. "Statistics that merely describe the[] employees as minority or non-minority and disclose whether they were fired or disciplined less severely proves nothing without more information about the particular circumstances involved in each situation."  Burke-Fowler v. Orange Cty., Fla., 447 F.3d 1319, 1325 (11th Cir. 2006) (finding insufficient statistics showing that "the County terminates minority correctional officers for fraternization with inmates over ninety percent of the time but that white correctional officers retain their jobs over sixty-six percent of the time for the same violation").  "Different types and degrees of misconduct may warrant different types and degrees of discipline."  Id.

number of individuals at each level, the qualifications of individuals in the applicant pool and of those hired for each position, or the number of openings at each level." Burgis v. N.Y. City Dep't of Sanitation, 798 F.3d 63, 70 (2d Cir. 2015) (finding statistics insufficient to save plaintiffs' pattern and practice claim from dismissal at the pleading stage).

Third, the compensation, performance ratings and promotion rates of employees of color were as high as, or higher than, their comparators in several TBS divisions. In TBS's Sports, Media and Research divisions, females of color received a higher performance rating than the average female or the average employee. ([1.2] at 2, 9, 11). In TBS's Public Relations, Strategy and Media divisions, males of color were paid the same as, or more than, the average male or the average employee. ([1.2] at 8, 9-10). In TBS's Research division, females of color were paid more than the average female. ([1.2] at 11). In TBS's Sports, Entertainment, News, and Research divisions, males of color had the same promotion rate, or a higher promotion rate, than the average male or the average employee. ([1.2] at 1-2, 5, 11). In TBS's Strategy, Finance & Accounting, Sports, and Entertainment divisions, females of color had the same promotion rate, or a higher promotion rate, than the average female or the average employee. ([1.2] at 3, 10).

42

Finally, the HR Report provides data for only three of the approximately twenty years in which Plaintiffs allege that Defendants engaged in race discrimination.[23]  It also reveals disparities in only a subset of TBS's divisions, and the relevance of the data to Defendants Turner, CNN and TS is not apparent from the report or the Complaint.

The HR Report, and Plaintiffs' class-wide allegations, do not support that Defendants engaged in a pattern and practice of intentional race discrimination against Plaintiffs and the Class.

      3.    Conclusion

Plaintiffs fail to state individual claims under section 1981 because they have not shown they were subject to intentional race discrimination.  Plaintiffs also fail to state a section 1981 claim on behalf of the putative Class because Plaintiffs are barred from representing the Class and, even if they were not, Plaintiffs fail to plausibly allege a pattern and practice of intentional race discrimination.  Count 1 is dismissed.

---

[23]    Most of this three-year period occurred outside the four-year limitations period applicable in section 1981 cases.  See Chandler v. Volunteers of Am., N. Alabama, Inc., 598 F. App'x 655, 665 (11th Cir. 2015) ("[A] § 1981 action must be filed within the four-year statute of limitations prescribed by 28 U.S.C. § 1658.").

D.     Counts 2 and 3 of Plaintiffs' Complaint

Counts 2 and 3 of the Complaint assert discrimination claims under

Title VII.  Plaintiffs appear to have withdrawn Counts 2 and 3 in response to

Defendants' Motion to Dismiss.  (See [26] at 1 n.1; [27.1] at 36; [34.1] at 2).

Even if they had not, Plaintiffs' Title VII claims are required to be dismissed for

failure to exhaust their administrative remedies.[24]

> In order to bring a viable claim in court under Title VII, a plaintiff
> must first exhaust administrative remedies.  First, in a non-deferral
> state such as Georgia, a plaintiff must file a complaint with the EEOC
> within 180 days of the alleged discriminatory act or acts.  Second,
> upon receiving a right-to-sue letter from the EEOC upon the
> termination of their investigation, the plaintiff may bring a civil action
> against the named respondent within 90 days by filing a complaint.

Gant v. Jefferson Energy Co-op., 348 F. App'x 433, 434 (11th Cir. 2009).  "The

plaintiff has the burden of establishing that she met the 90-day filing requirement."

Perry v. S. Wine Spirits, 511 F. App'x 888, 889 (11th Cir. 2013); see

Burnett v. City of Jacksonville, FL, 376 F. App'x 905, 906–07 (11th Cir. 2010)

(stating, in the context of the 90-day filing requirement, that "a plaintiff must

generally allege in her complaint that all conditions precedent to the institution of

the lawsuit have been fulfilled").

---

[24]     It is questionable whether there were grounds to allege these claims in the
first place.

Plaintiffs do "not allege that [they] filed a complaint with the EEOC or that [they were] issued a right-to-sue letter prior to filing the instant lawsuit.  Nor did [they] attach any documents to [their] complaint or allege any facts to suggest that [they] had exhausted [their] remedies with the EEOC."  Burnett, 376 F. App'x at 907.  This requires dismissal of Counts 2 and 3.  Id.; cf. Carter v. W. Pub. Co., 225 F.3d 1258, 1263 (11th Cir. 2000) ("A plaintiff who seeks to represent a class in a private Title VII suit must have standing to raise the class' claims and must satisfy the procedural requirements of Title VII.").  Defendants' Motion to Dismiss is granted.[25]

## IV.   PLAINTIFFS' MOTION TO AMEND

### A.   Legal Standard

Rule 15(a) of the Federal Rules of Civil Procedure allows a plaintiff to file one amended complaint, as a matter of course, if the amended complaint is filed within 21 days of service of the original complaint or within 21 days of the

---

[25]    Based on documents provided by Defendants, it appears that Colbert never filed an EEOC charge and that Henley filed her charge on May 30, 2014, and received her right-to-sue letter on May 7, 2015.  ([17.1] at 8-9; [17.2]; [17.3]).  Plaintiffs filed their Complaint on December 6, 2016, more than 90 days after Henley received her right-to-sue letter.  Henley's Title VII claims are thus time-barred.  See Patel v. Georgia Dep't of Behavioral Health & Developmental Disabilities, 517 F. App'x 750, 753 (11th Cir. 2013) (finding that plaintiff's Title VII claim was time-barred because plaintiff failed to file his complaint within 90 days of receiving his right-to-sue-letter).

defendant's filing of a responsive pleading or Rule 12 motion to dismiss.  See Fed.

R. Civ. P. 15(a)(1).  Amended complaints may be filed outside of these time limits

only "with the opposing party's written consent or the court's leave."  Fed. R. Civ.

P. 15(a)(2).  Defendants oppose Plaintiffs' motion to amend their Complaint.

Rule 15 provides that "[t]he court should freely give leave [to amend] when

justice so requires."  Fed. R. Civ. P. 15(a)(2).  "There must be a substantial reason

to deny a motion to amend."  Laurie v. Alabama Court of Criminal Appeals, 256

F.3d 1266, 1274 (11th Cir. 2001).  "Substantial reasons justifying a denial include

'undue delay, bad faith, dilatory motive on the part of the movant, . . . undue

prejudice to the opposing party by virtue of allowance of the amendment, [and]

futility of amendment.'"  Id. (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).

"A district court may deny leave to amend a complaint if it concludes that

the proposed amendment would be futile, meaning that the amended complaint

would not survive a motion to dismiss."  Christman v. Walsh, 416 Fed. App'x 841,

844 (11th Cir. 2011); Burger King Corp. v. Weaver, 169 F.3d 1310, 1320 (11th

Cir. 1999) ("[D]enial of leave to amend is justified by futility when the 'complaint

as amended is still subject to dismissal.'" (quoting Halliburton

& Assoc., Inc. v. Henderson, Few & Co., 774 F.2d 441, 444 (11th Cir. 1985)));

Bazemore v. U.S. Bank, N.A., No. 1:14-cv-3310, 2016 WL 889676, at *5 (N.D.

Ga. Mar. 8, 2016) ("Futility means that the amended complaint would fail to state a claim upon which relief could be granted.  Thus, the same standard of legal sufficiency as applied under a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is used to determine futility." (internal citation omitted)); Bill Salter Adver., Inc. v. City of Brewton, AL, 2007 WL 2409819, at *2 (S.D. Ala. Aug.23, 2007) ("The futility threshold is akin to that for a motion to dismiss; thus, if the amended complaint could not survive Rule 12(b)(6) scrutiny, then the amendment is futile and leave to amend is properly denied.").

   B.    Analysis

Plaintiffs seek leave to file an amended complaint to "incorporate . . . new facts and to clarify the allegations."  ([27] at 1-2).[26]  Defendants oppose Plaintiffs' motion on the grounds that the Proposed Amended Complaint would require dismissal and that amendment thus would be futile.  ([33]).  Plaintiffs' Proposed Amended Complaint retains Count 1, omits Counts 2 and 3, and offers no new substantive allegations.  It includes only cosmetic amendments—largely stylistic

---

[26]    Although Plaintiffs state that they seek to amend their Complaint to "add new plaintiffs," no new plaintiffs are named in the Proposed Amended Complaint. ([27] at 1).

47

changes—which do not cure the deficiencies in the Complaint.[27]  Because the

Proposed Amended Complaint would require dismissal for the same reasons as the

initial Complaint, Plaintiffs' Motion to Amend is denied as futile.

The Court also concludes it is unnecessary to allow Plaintiffs, who are

represented by counsel, the opportunity to file a further amended complaint.

Defendants' Motion to Dismiss notified Plaintiffs of their pleading failures and, in

response, Plaintiffs sought leave to file their Proposed Amended Complaint, which

also fails to state a claim.  A further opportunity to amend is not required.  See

Eiber Radiology, Inc. v. Toshiba Am. Med. Sys., Inc., 673 F. App'x 925, 929–30

(11th Cir. 2016) (We do not . . . require . . . leniency [in allowing opportunities to

amend] where a plaintiff has been represented by counsel.  We have never required

district courts to grant counseled plaintiffs more than one opportunity to amend a

deficient complaint."); Cornelius v. Bank of Am., NA, 585 F. App'x 996, 1000

---

[27]      For example, the Proposed Amended Complaint alters the spelling and
capitalization of several words and makes minor word-choice, grammatical and
punctuation changes.  (See, e.g., Compl. ¶¶ 12-13, 34-35).  The Proposed
Amended Complaint also includes conclusory allegations that were not in the
initial Complaint.  For example, Plaintiffs now allege, without elaboration, that
Henley and Colbert were "qualified for [their] job[s]" and that Colbert was
"substantially more qualified" than "other similarly situated employees" who
received promotions.  ([33.1] ¶¶ 9-10, 57).  Plaintiffs' conclusory allegations are
required to be disregarded and are insufficient to withstand a motion to dismiss.
See Jackson, 372 F.3d at 1263.

(11th Cir. 2014) ("[T]he subject complaint was Cornelius's second attempt to make a legally cognizable claim . . . .  Because Cornelius already had been given an opportunity to correct his pleadings, the judge was not required to give him another chance."); United States v. Fulton Cty., Georgia, No. 1:14-cv-4071, 2016 WL 4158392, at *15 (N.D. Ga. Aug. 5, 2016) (declining to allow a further opportunity to amend where, after a motion to dismiss was filed, plaintiffs submitted a proposed amended complaint that failed to state a claim); cf. Wagner v. Daewoo Heavy Indus. Am. Corp., 314 F.3d 541, 542 (11th Cir. 2002).

## V.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Leave to File Surreply in Opposition to Defendants' Reply in Support of its [sic] Motion to Dismiss [34] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss, Strike, and/or for More Definite Statement of Plaintiffs' Complaint [17] is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Leave to Amend the Complaint to Voluntarily Withdraw its [sic] Original Complaint [27] is **DENIED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**.

**SO ORDERED** this 25th day of July, 2017.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE